U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 APR -1 AM 10: 34

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

THERESA S.,                          )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        Case No. 2:17-cv-00122
                                     )
NANCY A. BERRYHILL,                  )
Acting Commissioner of Social Security, )
                                     )
            Defendant.               )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND DENYING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 12 & 16)

Plaintiff Theresa Sinclair is a claimant for Social Security Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act ("SSA"). She brings this action pursuant to 42 U.S.C. § 405(g) to reverse the

decision of the Social Security Commissioner that she is not disabled. On January 25,

2018, Plaintiff filed her motion to reverse. (Doc. 12.) On April 11, 2018, the

Commissioner filed her motion to affirm. (Doc. 16.) Plaintiff replied on April 26, 2018,

at which point the court took the pending motions under advisement.

Plaintiff is represented by Francis M. Jackson, Esq., Alexandra M. Jackson, Esq.,

Marc D. Pepin, Esq., and Tamara N. Gallagher, Esq. The Commissioner is represented

by Special Assistant United States Attorney Lorie Ellen Lupkin.

Plaintiff raises the following issues on appeal: (1) the Administrative Law Judge

("ALJ") determination of Plaintiff's Residual Functional Capacity ("RFC") was not

supported by substantial evidence; and (2) the ALJ improperly characterized a treating

physician opinion and a treating source opinion in his determination of Plaintiff's RFC.

## I. Procedural Background.

On July 16, 2015, Plaintiff filed a Title II application for DIB benefits and on August 13, 2015, she filed a Title XVI application for SSI. Both applications alleged a disability onset date of February 1, 2011. The Commissioner denied her applications on October 15, 2015, and on reconsideration on April 18, 2016. Thereafter, Plaintiff filed a written request for a hearing on April 24, 2016. On October 26, 2016, ALJ Thomas Merrill held a video conference hearing at which Plaintiff and Warren D. Maxim, a vocational expert ("VE"), testified. On December 14, 2016, ALJ Merrill issued a written decision finding Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review on May 5, 2017. As a result, ALJ Merrill's decision stands as the Commissioner's final decision.

## II. Factual Background.

Plaintiff is a thirty-eight year old woman who is married with two minor children. At the time of her alleged disability onset date, she was thirty years old. Plaintiff has a Bachelor's Degree in Fine Art and had previously worked as an engraver and as an administrative assistant. She ceased full time work in 2009 and has been self-employed as a freelance writer and editor since then. She alleges disability as a result of Multiple Sclerosis ("MS"), hypothyroidism,[1] anxiety, and depression.

### A. Plaintiff's Medical History.

In January 2011, Plaintiff went to the emergency room ("ER") because she was experiencing blurred vision, vertigo, vomiting, numbness, as well as paralysis in her left side and a loss of balance. An MRI was performed on January 20, 2011, yielding results that were characterized as "abnormal" and consistent with MS. (AR 855.)

On January 26, 2011, Plaintiff was referred to Jean Marie Prunty, M.D. who confirmed the MS diagnosis and recommended treatment with intravenous steroids. Plaintiff stated she was hoping to get pregnant and Dr. Prunty noted it would be

---

[1] Plaintiff had been diagnosed with hypothyroidism prior to her disability claim. An x-ray of her thyroid on May 22, 2012 revealed a "multinodular goiter." (AR 448.) It was subsequently determined that there were no suspicious nodules.

2

appropriate to discontinue treatment until after any pregnancy. At a February 8 visit with Dr. Prunty, Plaintiff was reevaluated and received a steroid injection to treat her MS. At that time, Plaintiff's MS symptoms had improved, but she still had numbness on the left side of her face and in her right hand. She reported that she was suffering from insomnia and anxiety and had delayed taking additional medications because she was attempting to get pregnant. Her symptoms had fully resolved by her April 13, 2011 appointment with Dr. Prunty.

On July 14, 2011, Dr. Prunty reported that Plaintiff was nine weeks pregnant with no active MS symptoms, although Plaintiff complained of fatigue. Dr. Prunty continued to recommend postponing treatment until the end of Plaintiff's pregnancy and breast feeding although she noted that there could be an exacerbation of Plaintiff's MS in the three to six months following giving birth. On October 19, 2011, Dr. Prunty noted Plaintiff was feeling well with no new MS symptoms. Plaintiff gave birth to her second child via cesarean section on February 9, 2012.

Andrew Solomon, M.D., a neurologist, was Plaintiff's primary treating physician for her MS. He initially examined Plaintiff on December 22, 2011, concluding based on her January 2011 MRI that her MS was clinically stable. Plaintiff reported no MS-related symptoms. With the exception of the MRI, Dr. Solomon's findings were within normal ranges. Dr. Solomon examined Plaintiff on February 23, 2012, and found her to be clinically stable post-partum. He recommended an MRI be taken in one to three months.

In April 2012, Plaintiff underwent a cranial MRI which revealed "new enhancing lesions[.]" (AR 855.) In May 2012, Plaintiff started on a course of medication, Rebif, to treat her MS. At a June 23, 2012 appointment with Dr. Solomon, she reported "severe fatigue" and "difficulty tolerating Rebif" as well as new flu-like and anxiety-related symptoms. (AR 556.) Dr. Solomon recommended an endocrinology consult to determine whether Plaintiff's symptoms were related to thyroid dysfunction.

On September 20, 2012, Plaintiff saw Dr. Solomon for a follow-up examination at which she reported frequent fatigue which had nonetheless improved since her last visit.

Side effects from the Rebif had also improved. Dr. Solomon's physical examination yielded findings within normal ranges.

A cranial MRI taken in December 2012 revealed Plaintiff's MS was stable. At an appointment with Dr. Solomon on January 2, 2013, Plaintiff reported frequent severe fatigue which usually occurred in the evening but was "not debilitating[.]" (AR 572.) Dr. Solomon opined that Plaintiff's MS was "stable and improved." (AR 574.)

At a May 9, 2013 appointment with Dr. Solomon, Plaintiff reported heat sensitivity. She also reported that her left leg would tire and drag and that she experienced frequent severe fatigue. Dr. Solomon noted that Plaintiff was tolerating Rebif well and her MS was stable. He discussed MS-related fatigue medication, but Plaintiff elected to defer using it.

On March 31, 2014, Plaintiff met with Dr. Solomon and reported sensitivity to cold, some double vision at the end of the day, fatigue, muscle and joint pain, and fatiguing of her left leg which she would drag behind her. She was also experiencing more negative side effects from the Rebif and had recently increased her dosage of thyroid medication. Plaintiff discussed worsening depression and Dr. Solomon decided to discontinue Rebif. Although Plaintiff's MS was clinically stable, Dr. Solomon started her on a new course of treatment, Tecfidera. Plaintiff was asked to discuss medication to treat her depression with her primary care physician. Dr. Solomon noted Plaintiff's depression might improve after stopping Rebif.

Plaintiff started Tecfidera in April 2014. She had a follow-up appointment with Dr. Solomon on May 30, 2014. At the time, Plaintiff's depression and muscle and joint pain had improved, but her severe fatigue and heat sensitivity had not. Dr. Solomon again discussed medication to address Plaintiff's fatigue, but Plaintiff elected to defer medication and instead planned to try to get more sleep at night and take naps. Results of Dr. Solomon's physical examination were normal.

On October 20, 2014, Dr. Solomon met with Plaintiff and noted that some numbness on Plaintiff's left side had returned, she continued to have double vision at the end of the day, and she had experienced significant severe fatigue which was improved

4

by napping. She also reported "some difficulty with memory" as well as pressure, described as a "band-like sensation that wraps around from front to back[.]" (AR 663-64.) The results of Dr. Solomon's physical examination were normal, and he opined that Plaintiff was "without evidence of relapse, but continue[d] to suffer from a number of symptoms [due to] her MS[.]" (AR 665.) Dr. Solomon offered to prescribe medications to treat her fatigue and the new symptoms, but Plaintiff stated the symptoms were "tolerable" and she did not elect to start any new medications. *Id.*

Plaintiff saw Dr. Solomon again on April 13, 2015, and reported similar symptoms as in prior appointments in addition to headaches and worsening severe fatigue. Plaintiff reported that she was attempting to work on weekends, but that it had "been challenging[.]" (AR 688.) Dr. Solomon noted Plaintiff was using a cooling vest to address her heat sensitivity. A physical examination yielded normal findings. Dr. Solomon described a recent February MRI as "stable[,]" but noted Plaintiff "continu[ed] to suffer from a number of disabling symptoms [due to] her MS[.]" (AR 690.) He discussed "strategies for difficulty multitasking and cognitive impairment in MS" and prescribed a trial of Amantadine to treat her MS-related fatigue. *Id.*

On September 8, 2015, Dr. Solomon examined Plaintiff who reported difficulty choosing words, "generalized weakness of arms and legs, and vertigo several times a week[,]" (AR 729) symptoms which were worse in hot temperatures. She had not yet tried Amantadine for fatigue, but her severe fatigue had worsened.

At a June 21, 2016 appointment with Dr. Solomon, Plaintiff reported more generalized weakness, greater fatigue, and noted that heat continued to exacerbate her symptoms. She also reported numbness on her left side that lasted for forty minutes at a time and blurry vision toward the end of the day. She stated it had been more difficult to complete work around the family's farm and that she had been falling and tripping more frequently. As a result, she was using a walking stick. A physical examination again yielded normal findings. Dr. Solomon counseled Plaintiff about managing her worsening symptoms and he opined that it "seem[ed] likely [left] sided symptoms are a ps[eu]dorelapse." (AR 858.) Plaintiff was slated to begin a trial of Amantadine for her

5

MS-related fatigue. Dr. Solomon ordered a physical therapy consult to evaluate whether Plaintiff could benefit from assistive devices to help with her balance.

Dr. Solomon authored a medical opinion dated September 12, 2016, which explained that Plaintiff has MS and suffers from weakness, fatigue, numbness, blurred vision, cognitive impairment, and heat intolerance as a result of her condition. He stated Plaintiff had been diagnosed based on a cranial MRI which showed brain inflammation and damage consistent with MS and noted that Plaintiff's prescribed medications, Cymbalta and Amantadine, impacted Plaintiff's ability to work. He left blank the sections regarding Plaintiff's function by function capabilities. He opined that Plaintiff's fatigue would cause her to be off task from doing "simple work" twenty percent of the day or more. (AR 853.) He noted that Plaintiff has episodic attacks or symptoms that will temporarily incapacitate her from working, and that the type and frequency of these attacks are "unpredictable" and could last "months[.]" *Id.*

During the period of her alleged disability, Plaintiff was treated by Doctors of Naturopathy at Stowe Natural Family Wellness. She began seeing Catharine Guaraldi, N.D., in 2013, in order to manage her MS and hypothyroidism. On August 18, 2014, Dr. Guaraldi stated that although Plaintiff's neurologic symptoms had been "reportedly stable" since at least 2013, Plaintiff had "a reduction in her ability to perform daily tasks and the side effects from her medications also affect her functioning." (AR 657.) Plaintiff reported symptoms of foggy thinking, slow speech processing, headaches, and vision changes. Dr. Guaraldi noted Plaintiff's short and long term memory appeared intact, but her ability to "perform and sustain mentally challenging tasks [was] limited at this time and her physical stamina [was] likewise reportedly low." *Id.* Dr. Guaraldi had administered "basic neurologic functional testing" which was relatively normal and "most deficient in eye tracking." *Id.*

Plaintiff saw Jennifer Tuttle, N.D., at Stowe Natural Family Wellness on January 13, 2016, for "long standing fatigue and [a] cough[.]" (AR 795.) Amantadine was listed as one of Plaintiff's medications. She reported urinary urgency related to MS, muscle aches and weakness, numbness and weakness on the left side of her body, dizziness,

fatigue, depression, and anxiety. Dr. Tuttle observed that Plaintiff was "alert and active" albeit lethargic. Her recent and remote memory were normal.

On May 31, 2016, Plaintiff had an annual physical exam with Morgan DeVoe, N.D., at Stowe Natural Family Wellness. Plaintiff reported fatigue, dizziness, cognitive issues, numbness and tingling on her left side, weakness in her limbs, headaches, shooting nerve pains in her hands and legs, blurred vision, and that her left leg dragged when she walked. She stated her prescribed medications were only mildly effective in treating her symptoms. Dr. DeVoe observed that Plaintiff was oriented to time and place with intact memory.

On September 29, 2016, Dr. DeVoe authored a medical opinion regarding Plaintiff's MS, hypothyroidism, and chronic fatigue where she listed the following symptoms: cognitive difficulties, memory issues, "mental fog," headaches, dizziness, vertigo, numbness and tingling on the left side of the body, fatigue, difficulty walking, double vision, stress incontinence, and heat sensitivity. (AR 860.) At the time, Plaintiff was being treated with Tecfidera, Amantadine, and Cymbalta, all of which had negative side effects. In response to the question: "If your patient is unable to spend a total of 8 hours doing a combination of sitting, standing, and walking in a competitive work environment, please explain why[,]" Dr. DeVoe stated that Plaintiff needs to nap once or twice a day for at least fifteen to thirty minutes. (AR 862.) She opined that Plaintiff's fatigue and cognitive impairment would result in Plaintiff being off task at work for twenty percent or more of the day and that Plaintiff would likely miss more than four days per month of work due to her medical conditions or treatment.

Plaintiff's medical record includes an ER visit on August 28, 2015, after she was hit in the head with a Frisbee. She presented with nausea and a headache and was assessed to have a bruise and a concussion. The examining physician, Neil J. Nigro, M.D., noted "no alteration in mental status" and stated Plaintiff was "alert and poorly responsive." (AR 824-25.)

**B. Plaintiff's Function Reports.**

Plaintiff and her spouse completed five function reports in connection with her application for DIB on August 1, 2014, November 18, 2014, August 30, 2015, September 25, 2015, and January 6, 2016. Each report contains the same substantive information, although the more recent reports state that Plaintiff was having increased difficulty counting change and engaging in cash transactions. Her spouse reported that Plaintiff was able to pay bills, handle a savings account, use a checkbook, and count change but that "[t]his is something that she checks and rechecks, [and it] takes her aw[h]ile to do." (AR 348.) Plaintiff indicated that she was prescribed a cooling vest in December 2014 which she wore when the temperature exceeded seventy-five degrees Fahrenheit.

In her function reports, Plaintiff stated that she lived with her family and spent her days assisting her children with dressing, playing, and getting ready for bed. She also assisted in the care of the family's animals, feeding and watering them, although her husband performed the more physically demanding work. Plaintiff cooked meals daily, but stated that she had to prepare meals ahead of time so as not to be rushed and required her husband's assistance with the cooking. Plaintiff did the dishes, laundry, cleaned, and gardened but needed help with the more physically demanding chores in these categories. She reported no problems with personal care, but had issues remembering to take her medications unless she followed a specific routine or set reminders for herself. She also noted that she did not handle stress well and that any changes to her routines caused her to feel anxious and disoriented.

Plaintiff reported taking one major trip to the grocery store per month which took her approximately an hour, with shorter weekly trips as needed. Her spouse reported these trips were exhausting for her. Plaintiff does not drive and does not have a driver's license. She expressed concern that her symptoms of vertigo, vision problems, and cognitive issues would make it dangerous for her to drive.

With regard to limitations due to her MS, Plaintiff stated that her condition interfered with her ability to work at her computer for long periods and if she "push[ed] [her]self too hard physically or mentally [she] ha[d] problems with fatigue." (AR 282.)

8

She also stated she had "cognitive difficulties with focusing [her] concentration or finding the right words." *Id.* She reported being very tired even after sleeping well and had to schedule rest periods throughout the day. She adjusted her process for cooking, cleaning, and yard work by moving slower or performing less strenuous jobs. She used coping skills like planning tasks in advance, making lists, and adjusting for issues with memory and focus. Her function reports stated that she worked in the past, but her concentration, fatigue, sensitivity to temperature, vision problems, and lack of coordination limited her from engaging in the customer service, restaurant, and engraver positions she held in the past. Plaintiff and her husband both noted she had become self-conscious in public and was "afraid of how [she] appear[ed] to others because of [her] condition." (AR 343.)

In her November 2014 function report, Plaintiff stated that MS affected her walking, talking, seeing, memory, ability to complete tasks, concentration, and ability to follow instructions and use her hands. In her August 30, 2015 function report, Plaintiff added that the MS affected her lifting, squatting, bending, standing, and stair climbing. Although she used to be able to do intricate work in fabric or gold and hike for long distances, she could no longer perform these activities.

## C. State Agency Examining Consulting Assessments.

On October 21, 2014, Gregory Korgeski, Ph.D. conducted a consulting psychological evaluation of Plaintiff to evaluate her alleged depression and anxiety. He observed Plaintiff to have normal posture and gait with no obvious pain and "subdued psychomotor behavior and flat facies[.]" (AR 677.) Dr. Korgeski noted that Plaintiff attributed her depressed appearance to fatigue, "[s]peech was low volume, average rate; she did not say much spontaneously and tended to answer questions with yes or no whenever she could, even when most people would naturally elaborate." *Id.* He found no evidence of speech, hearing, or vision impairments. Dr. Korgeski found Plaintiff to be of average intelligence, and she scored a twenty-eight out of thirty on a mini-mental status exam ("MMSE"). He noted she got "badly off track at the latter end of a serial subtraction task" during the MMSE. *Id.* His diagnostic impression was that Plaintiff had

9

a mild neurocognitive disorder associated with MS, possible depression, an anxiety disorder, and a possible phobia regarding driving. He opined that a further neuropsychological evaluation could be helpful because "she might also have some difficulties with memory and focus as a function of anxiety and the depression that may or may not be strongly present. Fatigue alone will account for some of the symptoms, however." (AR 678-79.) He concluded that the "[p]rimary condition affecting her functioning level does seem at this time to be a function of her physical condition[.]" (AR 679.)

Plaintiff was examined by J.P. Hayden, a licensed psychologist on October 1, 2015. He observed Plaintiff to have an "unsure gait" and that "[s]he moved slowly with a small rocking motion from side to side." (AR 778.) "Her left arm appeared to be limp, either at her side or crossed in her lap. She seem[ed] extremely reserved in her affect and d[id] not seem to verbalize pain or show it on her face." *Id.* He found her recent memory to be intact as she was able to recall three out of three objects. She scored a thirty out of thirty on a MMSE. Mr. Hayden opined that Plaintiff "d[id] not quite meet the threshold for a specific mood disorder or specific mood or anxiety disorder." (AR 779.) He found that "[h]er symptoms have a moderate to severe impact" on her activities of daily living. *Id.*

Fred Rossman, M.D. conducted a consultative physical exam of Plaintiff on April 13, 2016. He noted that a physical examination yielded normal results and demonstrated "no significant dizziness with [her] ability to ambulate, . . . no significant weakness or loss of motor strength." (AR 814.) He further noted Plaintiff communicated effectively, was able to answer questions regarding her medical history, and answered questions without hesitation.

### D. Non-Examining State Agency Consultants' Assessments.

On October 23, 2014, Edward Hurley, Ph.D., a state agency psychologist, reviewed Plaintiff's medical history and opined that Plaintiff had some anxiety and symptoms of depression which had no effect on her activities of daily living or social function. He noted that Plaintiff may experience some mild cognitive difficulties due to

fatigue related to her MS, but that none of her conditions resulted in significant functional limitations. He assessed only mild difficulties in her ability to maintain concentration, persistence, or pace.

Roy Shapiro, Ph.D., a state agency psychologist, provided a non-examining assessment of Plaintiff on December 22, 2014. He came to the same conclusion as Dr. Hurley, noting Plaintiff exhibited symptoms of anxiety and depression, and mild cognitive difficulties due to fatigue, but opined that this resulted in no significant functional limitations.

On October 3, 2014, Leslie Abramson, M.D., a state agency consulting physician, opined regarding Plaintiff's alleged disability due to MS and found Plaintiff had exertional limitations limiting her to carrying twenty pounds occasionally, carrying ten pounds frequently, standing or walking for four hours, and sitting for approximately six hours during a normal eight hour workday. Dr. Abramson noted that these limitations were "due to fatigue associated with medication management of MS[.]" (AR 73.) Dr. Abramson concluded that Plaintiff's "condition results in some limitations [to her] ability to perform work related activities. However, these limitations d[id] not prevent [her] from performing work [she] ha[d] done in the past as []an Engraver[.]" (AR 75.)

Geoffrey Knisely, M.D. provided a state agency reviewing assessment on December 23, 2014. In his review of Plaintiff's medical records, he noted that there was no medical evidence to support that Plaintiff was limited in the use of her hands, but that "fatigue in association with current therapy does limit [Plaintiff's] exertional ac[ti]vities[.]" (AR 71.) He agreed with the exertional limitations offered by Dr. Abramson, but suggested Plaintiff could walk or stand for six hours during the workday. He further opined that Plaintiff was not disabled based on her ability to perform her past relevant work as an engraver.

On October 15, 2015, Ellen Atkins, Ph.D., a state agency reviewing psychologist, assessed Plaintiff's mental conditions and noted Plaintiff had moderate difficultly in maintaining concentration, persistence, or pace. Dr. Atkins completed a "Mental Residual Functional Capacity Assessment" opining that Plaintiff "ha[d] understanding

11

and memory limitations" although her "ability to understand and remember very short and simple instructions" was "[n]ot significantly limited" as she "retain[ed] und[erstanding and] mem[ory] for 1-3 step instructions." (AR 98-99.) Dr. Atkins stated that Plaintiff's "ability to understand and remember detailed instructions[,]" "maintain attention and concentration for extended periods[,]" and "ability to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances" were all "moderately limited[.]" (AR 99.) Dr. Atkins opined that Plaintiff was "[l]imited for complex tasks and high production norm[al] tasks. [She had e]pisodic exacerbations in anxiety or depressive symptoms [that could] temporarily undermine [her] cognitive efficiency." *Id.*

Dr. Abramson provided a second non-examining consulting assessment regarding Plaintiff's alleged disability on October 15, 2015. After reviewing additional medical evidence from the intervening year, Dr. Abramson again concluded that Plaintiff was limited to four hours walking or standing during the work day due to MS. She opined that Plaintiff could perform three occupations which existed in significant number in the national economy: addresser, call-out operator, and surveillance-system monitor. Dr. Abramson stated she had insufficient vocational information to decide whether Plaintiff could perform past relevant work, but determined Plaintiff was not disabled because she could adjust to other work.

On April 14, 2016, Joseph Patalano, Ph.D. reviewed Plaintiff's medical records with regard to her anxiety and depression and found Plaintiff had moderate difficulties maintaining concentration, persistence, or pace. He performed an additional mental residual functional capacity assessment and determined that Plaintiff had "understanding and memory limitations[.]" (AR 130.) He also agreed with Dr. Atkins with regard to Plaintiff's moderate limitations in specified areas and opined that Plaintiff retained the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 131.)

12

On April 18, 2016, Donald Swartz, M.D. provided an additional non-examining consulting assessment for the reconsideration of Plaintiff's DIB claim. Plaintiff stated her condition "ha[d] gotten progressively worse over time, especially relating to cognitive function, balance, and vertigo." (AR 120.) Dr. Swartz adopted the same limitations as Dr. Abramson, concluding Plaintiff could carry twenty pounds occasionally, stand or walk for four hours per day, and sit for approximately six hours per day. Citing the same work positions as Dr. Abramson, he found Plaintiff not disabled noting she "can remember and follow basic instructions[,]" "[her] condition results in some limitations in [her] ability to perform work related activities[,]" and "[w]e do not have all of the sufficient vocational information to determine whether [she] can perform any of [her] past relevant work[,]" "[h]owever, based on the evidence in the file, we have determined that [she] can adjust to other less demanding work." (AR 134.)

### E. Testimony at the ALJ Hearing.

At the hearing before ALJ Merrill, Plaintiff testified that since her onset date she has been limited by her fatigue, mental confusion and cognitive difficulties, and has suffered from dizziness, vertigo, problems with dexterity, and difficulties while walking. With regard to her ability to work, she stated she works part time as a freelance writer and editor.

Plaintiff testified that on a typical day she wakes up, gets her children up for school, does light housework and then usually must nap or rest around midday for twenty minutes to a half hour with longer rest periods during the summer. After resting, she prepares dinner and helps her children with their homework and getting ready for bed. She stated she sometimes does some light gardening for a half hour but noted she could not complete complicated or difficult chores. When asked about her garden, she replied that it was not very large and that while she did the weeding, her husband "[did] all the heavy work in it" and that to work in the garden for more than half an hour at a time would require her to "push[] it." (AR 48-49.) After forty-five minutes of working in the garden, Plaintiff stated she would become dizzy and fatigued and have to take more breaks. Plaintiff's attorney asked about her dizzy spells and Plaintiff responded that they

13

lasted fifteen minutes to half an hour, and that when she experienced a dizzy spell she could not look at a computer screen, read, or watch television. Plaintiff testified that she had "extreme sensitivity to temperature fluctuations and higher temperatures ma[de] her fatigue a lot worse." (AR 56.)

With regard to her MS-related mental confusion, Plaintiff testified that she has trouble determining the steps in a task, for example, she stated she sometimes has difficulty remembering how to make coffee. She also stated she has difficulty remembering to do things at a particular time, like starting the laundry, cooking dinner, or taking her medications, and that she struggled to follow conversations. She testified that her husband helped her cook dinner because she is unable to cook complicated recipes on her own.

Plaintiff testified that her MS causes her to drag her left foot while walking which frequently results in her stumbling and stubbing her toe. She stated that if she uses a cane, she can walk for up to forty-five minutes and up to twenty minutes without it. She has numbness on the left side of her face and body and a "sharp, shooting pain" in her head as well as a sensation "like an electrical shock going through [her] brain and down [her] spine." (AR 53.) When asked about the effect of MS on her arms and hands, Plaintiff responded that her "manual dexterity isn't as good as it used to [be,]" she drops things a lot and her fingers feel clumsy. (AR 54.)

Regarding her prior employment, Plaintiff testified she cannot perform the job of an engraver because it "entails a high level of precision for getting it right the first time." (AR 55.) With regard to her previous work in customer service, Plaintiff stated that with her cognitive difficulties and challenges following conversations she would be unable to "maintain a good standard of customer service." *Id.* Although she wants to work, it is difficult for her to remain on task and concentrate. She stated that she was prescribed Tecfidera, Levothyroxine, and Cymbalta but had to discontinue Amantadine to address her fatigue because she was experiencing too many negative side effects. She stated there are no other treatments available.

14

ALJ Merrill asked whether Plaintiff spent any time on the internet. She replied that she uses it to check email, research her condition, and work on her writing. ALJ Merrill also inquired about her family's farm. Plaintiff responded that they no longer had sheep because she was unable to care for them, that they still have four chickens and seven rabbits, a cat, two dogs, and a pair of lovebirds, all of which her family helps care for because she is unable to care for them on her own.

The VE testified that Plaintiff's prior work experience was that of an engraver, customer service representative, editor, and writer, which he classified as skilled work performed at a sedentary exertional level. Plaintiff also had experience as an administrative assistant which the VE classified as a general office clerk, skilled work performed at a light exertional level. The ALJ presented the VE with three hypothetical individuals with Plaintiff's vocational and educational background. The first individual "has the ability to lift 20 pounds occasionally, 10 pounds frequently, stand or walk for four hours, sit for six hours, unlimited use of her hands and feet to operate controls and push and pull, and no other limitation." (AR 60.) The VE opined that, given those limitations, the hypothetical individual could perform Plaintiff's prior work except that of an administrative assistant.

The second hypothetical individual with the same limitations as the first would be limited to standing or walking for four hours and then standing and walking for six, and she had the "ability to understand and remember and carry out one to three step instructions during the typical two hour periods of an eight hour workday[.]" *Id.* The VE opined that all of Plaintiff's prior work was semi-skilled or very skilled and those limitations would eliminate all past work. The ALJ asked whether there were jobs the second hypothetical individual could perform. The VE responded that he or she could be a parking lot attendant, ticket seller, or toll collector, positions which existed in significant numbers in the national economy.

The third hypothetical individual

can lift 10 pounds occasionally, 20 pounds less than occasionally, can never climb ladders, balance and climbing stairs is less than occasional, the

remaining posturals are occasional, and use of her left extremity is less than occasional, right upper extremity is occasional, use of her feet to operate controls is less than occasional. During an eight hour work day she can stand for less than two hours, walk for less than two hours, but sit at least six hours.

(AR 61-62.)

The VE opined that with these limitations, the third hypothetical individual would not be able to perform past work but could be a surveillance system monitor or a call-out operator, positions which existed in significant numbers in the national economy. ALJ Merrill then added the limitation of needing to take a nap for fifteen to thirty minutes once or twice a day. The VE stated there were no jobs that could accommodate that limitation. Plaintiff's attorney inquired whether there would be any past work or other work available for someone who was "going to be off task 20% or more during the day, due to fatigue[.]" (AR 63.) The VE responded that the limitation would not allow for successful full-time work.

## III. Application of the Five-Step, Sequential Framework.

An ALJ must follow a five-step, sequential framework to determine whether a claimant is disabled:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted) (internal quotation marks omitted). At Step Five, "the

16

burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Merrill concluded at Step One that Plaintiff had not engaged in substantial gainful employment since her alleged onset date. At Step Two, he concluded that Plaintiff possessed the severe impairment of MS. He found that Plaintiff's hypothyroidism, anxiety, and depression were not severe. With regard to Plaintiff's alleged mental health impairment, the ALJ found that Plaintiff only had mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. He noted Plaintiff had experienced "no episodes of decompensation that have been of extended duration." (AR 26) (emphasis omitted).

At Step Three, the ALJ determined that Plaintiff's impairments, either in isolation or combination, met or medically equaled the severity of a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated Plaintiff's MS in the context of Listing 11.09, which addresses MS, but concluded that Plaintiff did not establish the requisite physical, visual, or cognitive limitations to satisfy the Listing. In support of this finding he noted that:

Despite the [Plaintiff's] severe impairments, I find that the claimant has not satisfied the narrow definition of a listed impairment as set forth in 20 C.F.R. 404.1520(d), 404.1525 and 404.1526, nor do the above impairments equal in severity a listed impairment. No expert designated by the Commissioner has offered an opinion that any of [Plaintiff's] impairments equal a section of the listed impairments. No accepted medical source on behalf of the claimant has offered an opinion that any of the claimant's impairments equal a section of the listed impairments. The claimant does not allege that the above impairments are of listing level severity, and has not met the burden of presenting medical evidence that supports such a finding.

Listing 11.09 establishes that multiple sclerosis is disabling based upon the medical evidence alone if, in relevant part, the [Plaintiff] has significant and persistent disorganization of motor function in two extremities with sustained disturbance of gross and dexterous movements or gait and station; or she has a visual [impairment] with loss of visual acuity, contraction of

17

the visual fields or loss of visual efficiency; or she has a cognitive deficit as described resulting in markedly impaired functioning in two domains; or she has significant and reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination.

(AR 27.)

At Step Four, ALJ Merrill found that Plaintiff "has the [RFC] to perform light work as defined in 20 CFR 416.1567(b) and 416.967(b) except that she is limited from standing and walking for about 4 hours of an 8-hour day." (AR 28.) In defining Plaintiff's RFC, the ALJ concluded that "[t]he objective evidence in [Plaintiff's] claim falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis." (AR 29.) "[Plaintiff] has failed to establish a correlation between the allegations and the objective medical evidence[.]" *Id.* Although Plaintiff had been diagnosed with MS based on a January 20, 2011 MRI, the ALJ found that "[t]he imaging and normal physical examination findings d[id] not support a conclusion of disability[,]" in part because her MS is "stable." (AR 30.)

In reaching his decision, ALJ Merrill considered Plaintiff's "assertion that she suffers from mental confusion" and noted that she "ha[d] reported such to her providers, but she ha[d] not been observed to exhibit signs consistent with this complaint." *Id.* He cited Dr. Korgeski's observation that Plaintiff "appeared to have average intellectual abilities and she reported being able to write for 1-2 hours at a time[.]" *Id.* ALJ Merrill also cited ER records from an August 2015 encounter during which Plaintiff's "mental status findings were normal[,]" and Mr. Hayden's determination that Plaintiff scored thirty out of thirty on the MMSE. *Id.* He further relied on Plaintiff not having exhibited any dizziness during any medical examinations and her April 2016 report that should could walk for thirty to forty minutes at a time and sit for two hours at a time. Finally, ALJ Merrill cited Dr. Solomon's June 2016 treatment notes which described Plaintiff's MS as stable, reported Plaintiff's physical examination was normal, and stated Plaintiff had been working around her farm.

18

ALJ Merrill afforded Dr. Guaraldi's opinion noting a deficiency in Plaintiff's vision tracking little weight because it was not supported by other "ongoing signs of visual disturbance" in the record. (AR 31.) He further pointed out that a Doctor of Naturopathy is not a medically acceptable source within the meaning of the SSA.

The ALJ acknowledged that Dr. Solomon was a treating physician but gave his opinion little weight, reasoning:

> Dr. Solomon admitted that he [was] unable to evaluate [Plaintiff's] ability to lift, carry, stand and walk. While he then contradicted this statement by asserting that the claimant would likely be off task as much as 20% of the day [due to fatigue], he did not provide any clinical findings to support this assessed limitation. Rather he appears to have relied on the [Plaintiff's] subjective complaints.

(AR 31.) ALJ Merrill found that Dr. Solomon's opinion regarding Plaintiff's fatigue was not consistent with his clinical findings "as he has consistently observed that [Plaintiff] has intact gait and normal strength." *Id.* ALJ Merrill also noted that Dr. Solomon's opinion was "inconsistent with the opinions of State Agency reviewing physicians Dr. Abramson and Dr. Swartz" concluding "[l]imited weight is afforded to [Dr. Solomon's] opinion because of the lack of documentation to support any of the limitations opined." *Id.*

Little weight was also afforded to the opinion of Dr. DeVoe because ALJ Merrill found that Dr. DeVoe was not an "acceptable medical source" and her opinion "did not document any clinical findings consistent with the assessed limitations." *Id.* Instead, Dr. DeVoe merely recorded Plaintiff's complaints while finding "she exhibited normal memory, mood, and affect." *Id.*

The ALJ assigned great weight to the opinions of State Agency reviewing physicians Drs. Abramson and Swartz because "both sources reviewed the medical evidence and provided citations to support the limitations assessed." (AR 32.) He noted that although additional medical records were generated following their assessments, those records "show[ed] stable signs consistent with the earlier evidence upon which these sources relied." *Id.*

19

The ALJ stated "[s]ome, but limited weight" was afforded to the October 2014 opinion of consultative psychologist Dr. Korgeski. (AR 32.) He noted Dr. Korgeski had "diagnosed a neurocognitive disorder associated with [MS, but] noted that this was only mild" and had not provided "any specific limitations of function[.]" *Id.* Limited weight was attributed to the reports by consultative psychologist Dr. Hayden and consultative physician Dr. Rossman because they "did not offer any specific limitation of function." *Id.*

ALJ Merrill concluded that Plaintiff had "maintained a wide-variety of daily activities at all times relevant to this decision. Her treating neurologist ha[d] consistently observed that she maintains normal gait, station and use of the upper extremities . . . and she deferred to take medication to address her complaints of fatigue." *Id.* He therefore determined that "[t]he opinions of State Agency reviewing physicians Dr. Abramson and Dr. Swartz are consistent with the medical record as a whole and with [Plaintiff's] daily activities." *Id.* In reaching this conclusion, the ALJ cited evidence of a slightly "wide-based gait[,]" (AR 29) but did not cite evidence of an "unsure gait[,]" (AR 778) or Plaintiff's left foot dragging and use of a cane.

At Step Five, the ALJ found that Plaintiff could perform past relevant work as an engraver and as a customer service representative. He therefore concluded that Plaintiff was not disabled.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)) (internal quotation marks omitted). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

## B.    Whether Substantial Evidence Supported the RFC Determination that Plaintiff Was Capable of Performing Past Relevant Work.

Plaintiff contends that ALJ Merrill's RFC determination is not supported by substantial evidence for two reasons.  First, ALJ Merrill failed to include a RFC limitation for concentration, persistence, and pace, and that if he had included the appropriate limitation, Plaintiff's RFC would not have supported a finding that she could perform past relevant work.[2]  Second, Plaintiff asserts that the ALJ failed to give appropriate weight to the treating physician opinion of Dr. Solomon and the opinion of Dr. Guaraldi and argues that, if he had given them appropriate weight, he would have found her disabled.

### 1.    RFC Determination Regarding Plaintiff's Alleged Cognitive Impairments.

ALJ Merrill found Plaintiff only had a mild limitation in concentration, persistence, and pace.  Accordingly, his RFC determination did not provide any restrictions with regard to Plaintiff's abilities in these areas.  Plaintiff contends this was reversible error because there is substantial evidence in the record that she is limited in concentration, persistence, and pace and the ALJ's contrary conclusion improperly relied on the outdated consulting assessment of Dr. Hurley.  As the Commissioner points out, Dr. Hurley's assessment was performed in 2014, more than three years after Plaintiff's alleged onset date.

---

[2] Plaintiff describes this problem as beginning with the ALJ's analysis at Step Two, however, because she does not challenge the ALJ's determination that her alleged mental health impairments were not severe, this argument is more properly addressed with her challenge to the ALJ's RFC determination.

21

In according "substantial weight" to the opinion of Dr. Hurley, ALJ Merrill found that Dr. Hurley's opinion was consistent with the consultative examinations conducted by Mr. Hayden and Dr. Rossman and also consistent with Plaintiff's reported activities of daily living including freelance writing, which the VE testified required a high level of skill. In 2014, Drs. Shapiro and Hurley opined that Plaintiff only had mild difficulties maintaining concentration, persistence, and pace. Plaintiff's MMSEs were within normal ranges and doctors consistently found her to be oriented to time and place without any obvious limitations to recent or remote memory.

In addressing Plaintiff's mental health limitations, the ALJ accorded substantial weight to a non-examining consultant's opinion from 2014. While it was appropriate to consider this opinion because it is from the period during which Plaintiff alleges disability, the opinions of Drs. Hurley and Shapiro predate the opinions of Drs. Atkins and Patalano who both noted Plaintiff had moderate limitations in maintaining concentration, persistence, or pace based on medical records from 2015 and 2016, respectively. *See Thomas v. Berryhill*, 337 F. Supp. 3d 235, 244 (W.D.N.Y. 2018) ("[A]n ALJ may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.") (internal quotation marks omitted).

Substantial evidence in the record supports a conclusion that Plaintiff's ability to maintain concentration, persistence, and pace declined over time due to her MS, fatigue, and prescription medications.[3] Dr. DeVoe opined that Plaintiff had cognitive limitations while Dr. Korgeski noted that although Plaintiff's MMSE was normal, she "[got] badly off track at the latter end of a serial subtraction task" during the exam. (AR 677.) The

---

[3] For example, Plaintiff reported cognitive issues to Drs. Solomon and DeVoe, and testified she had issues with memory and cognition during the ALJ hearing. With regard to her activities of daily living, Plaintiff noted she had to set reminders to ensure she took her medication and had to plan out tasks in order to complete them. Her function reports indicate she had stopped using cash, opting for credit card transactions so that she did not get confused. In his third party function report, her husband confirmed that paying bills, counting change, and managing bank accounts were tasks which took Plaintiff "aw[h]ile" and "she checks and rechecks[.]" (AR 348.) Plaintiff told Dr. Korgeski that due to her MS, she was unable to "devote a full day to writing" because her eyesight "g[ot] bad after a few hours so she c[ould] only do one or two hours of work at a time." (AR 675.)

2015 and 2016 opinions of non-examining consulting physicians Drs. Abramson and Swartz identified positions that Plaintiff could perform that included unskilled work. Although ALJ Merrill assigned their opinions great weight, he did not limit Plaintiff's employment to unskilled work. He also did not address Plaintiff's function reports or hearing testimony on this issue.

Dr. Hurley did not examine Plaintiff and his opinion is the most dated determination of Plaintiff's mental capacity. "[M]edical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (internal quotation marks omitted), *aff'd*, 652 F. App'x 25 (2d Cir. 2016); *see also Jones v. Comm'r of Soc. Sec.*, 2012 WL 3637450, at *2 (E.D.N.Y. Aug. 22, 2012) (holding that a disability examiner's opinion that was "1.5 years stale, and did not account for [plaintiff's] deteriorating condition" did not constitute substantial evidence); *Jones v. Colvin*, 2015 WL 4628972, at *4 (W.D.N.Y. Aug. 3, 2015) (finding that an ALJ improperly gave significant weight to consultative physicians who "did not have before them approximately four years of [p]laintiff's medical records").

In contrast, the 2015 and 2016 medical opinions of Mr. Hayden, and Drs. Rossman, Atkins, and Patalano conclude Plaintiff had at least moderate mental limitations consistent with Plaintiff's subjective complaints. The ALJ had an obligation to at least consider this evidence and determine whether it reflected a deterioration in Plaintiff's cognitive capacity. This error was not harmless because the VE testified that if Plaintiff was limited to carrying out one-to-three-step instructions, Plaintiff could not perform any prior relevant work which was semi-skilled or very skilled. On remand, the ALJ must reconsider Plaintiff's RFC determination in light of all the evidence in the record and make a new Step Five determination if appropriate.

### 2. Dr. Solomon's Treating Physician Opinion Regarding Plaintiff's Fatigue.

A treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, the opinion is generally entitled to some weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence[.]" 20 C.F.R. § 404.1527(c)(2).

"[Specific F]actors [] must be considered when the treating physician's opinion is not given controlling weight[.]" *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). These factors include: the length of the treatment relationship; the frequency of examination; the supportability of the opinion; whether the opinion is consistent with the record as a whole; and whether the opinion is given by a specialist about medical issues related to his or her area of specialty. 20 C.F.R. § 404.1527(c). After considering these factors, the ALJ must "give good reasons" for according less than controlling weight. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal quotation marks omitted).

The failure to provide good reasons for rejecting the opinion of a treating physician is grounds for remand. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician . . . a remand is necessary in order to allow the ALJ to reweigh the evidence.").

ALJ Merrill cited Plaintiff's declination of medication to treat her MS-related fatigue as evidence that Dr. Solomon's opinion regarding the magnitude of Plaintiff's fatigue was not supported by the record. Plaintiff took Amantadine in an attempt to address her fatigue but was unable to continue that medication because of its negative side effects. "In order to get benefits [claimants] must follow treatment prescribed by []

24

medical source(s) if th[e] treatment is expected to restore [a claimant's] ability to work."
20 C.F.R. § 404.1530(a). However, an ALJ is required to consider whether medication is
declined "because the side effects [were] less tolerable than the symptoms." SSR 16-3P,
2016 WL 1119029, at *9 (Mar. 16, 2016); *see Grubb v. Apfel*, 2003 WL 23009266, at *4
(S.D.N.Y. Dec. 22, 2003) ("[A] claimant may be denied disability benefits if the
Secretary finds that she *unjustifiably* failed to follow prescribed treatment and that if she
had followed the treatment, she would not be disabled under the Act.") (emphasis
supplied).

ALJ Merrill further concluded that Dr. Solomon's reliance on Plaintiff's
subjective complaints was inappropriate. However, a treating physician may consider a
patient's subjective complaints in rendering diagnoses and affirming opinions regarding
the patient's functionality especially with regard to complaints of pain and fatigue which
may not manifest themselves in objective clinical findings. *See Green-Younger v.
Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [the doctor] . . . relied on [the
claimant's] subjective complaints hardly undermines his opinion as to her functional
limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.")
(internal quotation marks and brackets omitted); *see also* SSR 16-3P, 2016 WL 1119029,
at *2 ("We evaluate the intensity and persistence of an individual's symptoms so we can
determine how symptoms limit ability to perform work-related activities[.]"); *Sisco v.
United States Dept. of Health and Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993)
("[T]here is no 'dipstick' laboratory test for chronic fatigue syndrome. . . . The ALJ's and
the district court's reading of § 223(d)(5)(A) of the [SSA] would mean that chronic
fatigue syndrome, and other disabilities that cannot be diagnosed with a 'dipstick,' could
never be recognized as disabilities under the Act.").

ALJ Merrill also stated that Dr. Solomon's opinion regarding Plaintiff's fatigue
was inconsistent with the findings that Plaintiff had "intact gait and normal strength[.]"
(AR 31.) The two conclusions are not, however, mutually exclusive and there is no
dispute that Plaintiff used a cane and sometimes dragged her left leg while walking. At
least one acceptable medical source documented Plaintiff had an unsure gait. If ALJ

Merrill concluded that Dr. Solomon had failed to adequately address Plaintiff's physical or mental fatigue, he was required to "recontact [Dr. Solomon] for clarification of the reasons for the opinion." SSR 96-5P, 1996 WL 374183, at *6 (July 2, 1996).[4]

ALJ Merrill did not acknowledge that Dr. Solomon had a lengthy treating relationship with Plaintiff from 2011 to 2016. As a neurologist, Dr. Solomon's opinions regarding Plaintiff's MS were "about medical issues related to his or her area of specialty[.]" 20 C.F.R. § 404.1527(c)(5). Not only is MS a degenerative illness, but Dr. Solomon met regularly with Plaintiff to assess her health and condition and to document the progression, if any, of her disease. He was, therefore, "the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]" 20 C.F.R. § 404.1527(c)(2). Although Plaintiff's MS was often deemed clinically stable, she complained of worsening fatigue throughout her treatment. Dr. Solomon credited this complaint as legitimate because he prescribed medications to treat it. Other sources in the record also credited Plaintiff's complaints of severe MS-related fatigue.

Listing 11.09 establishes that MS is disabling if there is "significant and reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination[,]" (AR 27) any doubt on that point should have been resolved by ordering a medical examination. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[T]he ALJ generally has an affirmative obligation to develop the administrative record."); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly[.]").

---

[4] ALJ Merrill concluded that "[l]imited weight is afforded to [Dr. Solomon's] opinion because of the lack of documentation to support any of the limitations opined." (AR 31.) Although it is not entirely clear what type of documentation the ALJ determined was missing, a 2012 MRI which revealed new MS lesions and Dr. Korgeski's consulting examination found Plaintiff exhibited a "depressed appearance" and had difficulties with memory due to fatigue. (AR 677.)

Because ALJ Merrill erred in failing to provide "good reasons" for assigning little weight to Dr. Solomon's opinions, a remand for a determination of the good reasons, if any, for according Dr. Solomon's opinions less than controlling weight is required. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (holding that "because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion[,] . . . remand is necessary") (internal citation omitted).

### 3. Dr. Guaraldi's Opinion.

Plaintiff asserts that ALJ Merrill erred by failing to provide good reasons for assigning little weight to Dr. Guaraldi's opinion because she was a treating source. Dr. Guaraldi is a Doctor of Naturopathy which is not an "acceptable medical source" under the SSA Regulations, but rather qualifies as an "other source[.]" SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). As an "other source" Dr. Guaraldi's opinion is not entitled to controlling weight. However, an ALJ "may use evidence from 'other sources' . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *Id.* An ALJ's decision "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

An ALJ should analyze "other source" opinions using the factors set forth in 20 C.F.R. § 404.1527(c), although "[n]ot every factor for weighing opinion evidence will apply in every case." *Id.* at *5. Thus, "while the Commissioner is [] free to decide that the opinions of 'other sources' . . . are entitled to no weight or little weight, those decisions should be explained." *Slattery v. Colvin*, 111 F. Supp. 3d 360, 372 (W.D.N.Y. 2015) (internal citations omitted).

ALJ Merrill explained his decision to give little weight to Dr. Guaraldi's opinion, citing her status as an "other source" and noting her clinical finding of a visual disturbance in August 2014 had no other support in the record. At the time Dr. Guaraldi

27

issued her opinion, she had been treating Plaintiff for a year and a half. Dr. Guaraldi regularly examined Plaintiff and received treatment notes from Dr. Solomon. Although she is an "other source," her opinion provides a second detailed and longitudinal picture of Plaintiff's condition. Her opinion is also consistent with other evidence in the record. Contrary to the ALJ's conclusion, Plaintiff regularly reported experiencing blurred vision at the end of the day to her treatment providers.

Listing 11.09 identifies a "loss of visual acuity[,]" (AR 27) as relevant to a disability determination. It is beyond dispute that visual acuity is required for Plaintiff's past work as an engraver. Although Dr. Guaraldi is not a treating physician, on remand the ALJ must explain why her opinion is entitled to little weight pursuant to 20 C.F.R. § 404.1527(c).

## D. Whether the ALJ's Step Four Finding Was Factually Unsupported and Legally Erroneous.

Plaintiff asserts that ALJ Merrill "failed to either develop or explain his conclusions [] that the engraver and customer service and representative occupations constituted past relevant work [and address] whether [Plaintiff] actually retained the RFC to perform them." (Doc. 12 at 6.) On remand, as part of reconsidering the weight assigned to the opinions of Drs. Solomon and Guaraldi, the ALJ must "consider further and explain how the medical evidence supports the RFC determination, gathering such additional evidence and testimony as may be necessary." *Aung Winn v. Colvin*, 541 Fed. App'x 67, 70 (2d Cir. 2013); *see also Smith v. Comm'r of Soc. Sec.*, 2011 WL 6372792, at *9 (D. Vt. Dec. 20, 2011) (remanding because "[t]he failure to evaluate the medical evidence . . . and the failure to explain the apparent rejection of medical opinions . . . w[ere] legal error[s which] prevent[ed] the Court from ascertaining whether substantial evidence supported the ALJ's decision").

## E. Transfer to a New ALJ.

Plaintiff requests that a different ALJ be assigned on remand, citing cases from this district in which ALJ Merrill has allegedly "had difficulty complying with the orders of the federal courts on remand." (Doc. 12 at 8 n.2.) In this case, the ALJ has not

manifested a lack of fairness or personal hostility to the Plaintiff. *See Johnson v. Astrue*, 2011 WL 2938074, at *2 (D. Conn. Feb. 15, 2011) (ruling that "when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate"); *see also Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 293 (E.D.N.Y. 2004) (observing that remand to different is ALJ justified where ALJ exhibited "personal hostility" towards plaintiff). The court nonetheless agrees that the Commissioner should consider whether to remand to a different ALJ to ensure prompt compliance with the court's remand instructions. *See Johnson*, 2011 WL 2938074, at *2.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion to reverse (Doc. 12), DENIES the Commissioner's motion to affirm (Doc. 16), and REMANDS the case for proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 1st day of April, 2018.

Christina Reiss, District Judge
United States District Court